IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MARKUS J. WOODRING,** | : | CIVIL ACTION NO. 1:18-CV-1158 |
| Plaintiff | : | (Chief Judge Conner) |
| v. | : | |
| **REPUBLICAN CAUCUS OF THE PENNSYLVANIA HOUSE OF REPRESENTATIVES,** *et al.*, | : | |
| Defendants | : | |

**MEMORANDUM**

Plaintiff Markus J. Woodring ("Woodring") asserts eight civil rights, statutory, and common law claims against his former employer, the Republican Caucus of the Pennsylvania House of Representatives (the "House Republican Caucus" or the "Caucus") as well as several elected leaders and Caucus staffers. Defendants move to dismiss Woodring's complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). The court will grant defendants' motion in part and deny it in part.

**I.**   **Factual Background and Procedural History**

The instant litigation arises from Woodring's employment with the House Republican Caucus, which terminated in March 2018. (Doc. 1 ¶¶ 47-49). Woodring names ten defendants: the House Republican Caucus; Representative Mike Turzai ("Representative Turzai") and Representative Dave Reed ("Representative Reed"), each of whom is a member of the Caucus; Missy Haga Croman ("Croman"), the

Caucus's Human Resources Director; Karen Coates[1] ("Coates"), former Chief of Staff and Chief Counsel to Representative Turzai; Rod Corey ("Corey"), Chief Counsel to the Caucus; Steven Eaton ("Eaton"), the Caucus's IT Director and Woodring's immediate supervisor; Anthony Aliano ("Aliano"), Chief of Staff to Representative Reed; Teresa Hart Kepner ("Kepner"), the Caucus's Assistant Human Resources Director; and Ann Hicks ("Hicks"), the Caucus's Assistant Controller.[2]  (Id. ¶¶ 11-20).

Woodring was employed in the Caucus's IT Department as a hardware technician from 2005 through his termination in March 2018.  (See id. ¶¶ 1, 24, 47-49).  "Sometime in 2008," Woodring spoke to representatives of the Pennsylvania Attorney General's Office to assist with what eventually became known as the "Computergate" investigation.  (Id. ¶ 27).  That investigation concerned use by certain House members and staffers of Caucus IT resources for campaign activities.  (See id. ¶¶ 25-27).  According to Woodring, after he cooperated with the investigators, he was retaliated against and threatened with termination by nonparty Caucus employees attempting to obstruct the investigation.  (Id. ¶ 28).

---

[1] The court takes judicial notice of the fact that Karen Coates passed away on January 17, 2019.  See *Obituary, Karen S. Coates,* http://obits.pennlive.com/obituaries/pennlive/obituary.aspx?n=karen-s-coates&pid=191313285&fhid=28178 (last visited Mar. 27, 2019); see also FED. R. EVID. 201(b)(1).  Any claim against Karen Coates in her personal capacity is thus extinguished.  See FED. R. CIV. P. 25(a)(2).

[2] Woodring also names as defendants "John and Jane Does #1 – 10."  (Doc. 1 ¶ 21).  Fact discovery has been ongoing, but Woodring has not moved to amend his complaint to identify the Doe defendants, nor does it appear that he has effected service on the Doe defendants.  We will order Woodring to show cause why the claims against the Doe defendants should not be dismissed pursuant to Federal Rule of Civil Procedure 4(m).  See FED. R. CIV. P. 4(m).

Woodring takes issue with several other alleged incidents during the course of his employment. Woodring asserts that his repeated complaints of government waste went unanswered by a number of individuals, including defendants Eaton, Croman, and Coates. (Id. ¶¶ 32-39). He also asserts that one of his coworkers, the nephew of a nonparty member of the House of Representatives, falsely accused him of assault at the end of 2008, and that Woodring "had to endure an investigation into this alleged assault" and "was threatened with termination should he be found guilty." (Id. ¶ 29). Woodring explains that he was found innocent and conveys his displeasure that his accuser remains "employed, if not promoted by the Caucus." (See id.) Woodring states that his personnel file still contains a description of this allegation despite his request that it be removed. (Id. ¶ 30).

Woodring contends that he was "repeatedly and continually denied raises and/or promotions" following his cooperation with the Attorney General's Office. (Id. ¶ 31). However, he does not specify any particular raises or promotions that he believes he was wrongly denied. (See id.) In late 2016, Woodring asked defendant Croman whether the Caucus had a hiring policy; Croman allegedly responded that a policy existed but that it was informal and had not been reduced to writing. (See id.) Defendant Corey subsequently informed Woodring that the Caucus did have a written hiring policy, which Corey produced to Woodring. (Id.) Woodring avers that defendant Eaton, the head of the IT department, violated this policy by not providing a list to Human Resources of potential candidates for available positions. (Id.) Woodring maintains that Eaton "simply handpicked whomever he wanted for the position." (Id.)

Woodring required back surgery in August 2016. (Id. ¶ 40). Because he had exhausted most of his personal leave time, Woodring sought permission to request leave donations in accordance with the Caucus's Donated Leave Policy. (Id.) That policy, as described in the complaint, allows full-time Caucus employees to request donations of leave for "a catastrophic illness or injury" as defined therein. (Id. ¶ 41). Woodring asserts that Croman denied his request for leave donations before even receiving his application and without reviewing physician statements or supporting documentation. (Id. ¶ 42). Woodring alleges that he was "written up for asking to borrow time." (Id. ¶ 43). He further alleges that, upon his return to work in September 2016, he was "written up for using his own borrowed time" and for "taking a sick day when he was allegedly short by one-half an hour." (Id. ¶ 44). On May 15, 2017, Woodring met with defendant Kepner, the Caucus's Assistant Human Resources Director, to review his personnel file. (Id. ¶ 45). Woodring claims that this review confirmed that he had no write-ups or issues with sick time prior to 2016, prompting him to file a charge with the Equal Employment Opportunity Commission ("EEOC"). (Id.)

The last incident described in the complaint is Woodring's termination. Woodring alleges that he was summoned to the Human Resources office on March 2, 2018, at 4:00 p.m. for a meeting at which defendants Kepner, Corey, and Hicks were present. (Id. ¶ 47). Woodring avers that he "expected" he was being fired because, beginning sometime earlier that day, "his card was locked, his badge did not work, and he could not access his own computer." (Id.) A disagreement arose when Woodring informed the group that he was recording the meeting. (Id.)

4

Eventually, someone contacted defendant Aliano, who instructed those present to adjourn the meeting until the following Monday. (Id.) Woodring claims that the meeting nonetheless continued and "was described by the HR representatives as being 'informational.'" (Id.) Woodring indicates that he "was then told that he was being fired," although he does not state by whom. (Id.) Woodring asserts that he asked for an explanation but "was simply told," again by an unidentified individual, "that he had violated 'many Caucus policies.'" (Id.) Thereafter, Capitol Police and House Security escorted Woodring from the building. (Id. ¶ 48).

Defendant Croman sent Woodring a follow-up letter dated March 7, 2018, confirming his termination. (Id. ¶ 49). This letter states:

> On Friday, March 2, 2018, you were informed of your termination of employment effective immediately; you will remain on the payroll through March 23, 2018. Your termination of employment is due to multiple violations of the Pennsylvania House of Representatives Republican Caucus Employee Handbook which[] include but are not limited to:
>
> House Republican Caucus Email Policy - Appropriate use of the e-mail system must serve the legitimate public interest of the Republican Caucus of the House of Representatives and its Members. Unacceptable use of the email system includes but is not limited to: [3] Transmitting any message for the purpose of intimidating, harassing or abusing others or which is offensive or defamatory in nature.
>
> House Republican Caucus Internet Policy - Employees are prohibited from using internet connections, including connections to social media, for improper purposes, including[] but not limited to usage in the following [manner] : [9] To post or transmit information or communications that are defamatory, fraudulent, or deceptive; [12] To use the Internet in such fashion that impairs the legitimate work product of the employee or

5

> causes disruption to the work of others; [16] To use the system in an [sp] manner that is inconsistent with the best interests of the Republican Caucus, or which will cause it, its members or its employees to be ridiculed or held in disrepute.
>
> House Republican Caucus Social Media Policy - Employees of the House Republican Caucus shall not post or transmit to any social media any information which . . . "is harassing, defamatory or degrading concerning the House Republican Caucus, its members or employees" regardless of whether such post is made during the employees' working hours or via any system or equipment owned or operated by Republican Information Technology Services.

(Id. (fourth modification in original)). Woodring contends that this letter ignored a key provision in the social media policy which exempted speech on matters of public concern from the policy's scope. (Id.)

Woodring claims that he was "left guessing" what he had done until a March 24, 2018 unemployment compensation hearing. (Id. ¶¶ 51-52). He indicates that counsel (ostensibly for the Caucus) introduced documents during the hearing, including a March 1, 2018 Facebook posting by Woodring. (Id. ¶ 51). The posting attached an article from a local news outlet bearing the headline: "Pa. lawmaker accused of abusive behavior and sexual misconduct called on to resign." (Id.; see also id. at 36, 37). Woodring included the following commentary with his post: "Wow! Here's the collusion that everyone's been looking for. Two women, same attorney? That's not coincidence by chance. Innocent until proven guilty! I smell a railroad somewhere!!" (Id. ¶ 51; see also id. at 36-37). In comments below the post, Woodring added:

6

> Speaking from my own experience, I wouldn't trust any
> internal investigation by any House Republican Legal
> staff, Capitol Police, or Republican HR staff! Their job is
> to always protect the institution and f[***] the employees.
> Unless your [sic] Leadership, then you can threaten
> people's jobs, threaten people's lives and they reward
> you with f[***]ing raises! Nobody polices the Legislature
> or Senate.

(Id. at 39). Woodring maintains that his "clear intent was to protest the possibility of an elected official's being railroaded out of office without due process." (Id. ¶ 52).

Woodring received right-to-sue letters from the EEOC on March 9 and March 28, 2018. (Id. ¶ 9). On June 6, 2018, he commenced this action with the filing of an eight-count complaint. Defendants move to dismiss the complaint in its entirety pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). The motion is fully briefed and ripe for disposition.

## II. Legal Standard

### A. Rule 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) provides that a court may dismiss a claim for lack of subject matter jurisdiction. See FED. R. CIV. P. 12(b)(1). Such jurisdictional challenges take of one two forms: (1) parties may levy a "factual" attack, arguing that one or more of the pleading's factual allegations are untrue, removing the action from the court's jurisdictional ken; or (2) they may assert a "facial" challenge, which assumes the veracity of the complaint's allegations but nonetheless argues that a claim is not within the court's jurisdiction. Lincoln Benefit Life Co. v. AEI Life, LLC, 800 F.3d 99, 105 (3d Cir. 2015) (quoting CNA v. United States, 535 F.3d 132, 139 (3d Cir. 2008)). In either instance, it is the

plaintiff's burden to establish jurisdiction. See Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977).

**B.    Rule 12(b)(6)**

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for the dismissal of complaints that fail to state a claim upon which relief may be granted. FED. R. CIV. P. 12(b)(6). When ruling on a motion to dismiss under Rule 12(b)(6), the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008) (quoting Pinker v. Roche Holdings, Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002)). In addition to reviewing facts contained in the complaint, the court may also consider "matters of public record, orders, exhibits attached to the complaint and items appearing in the record of the case." Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010) (citing Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993)).

Federal notice and pleading rules require the complaint to provide "the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Phillips, 515 F.3d at 232 (alteration in original) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). To test the sufficiency of the complaint, the court conducts a three-step inquiry. See Santiago v. Warminster Township, 629 F.3d 121, 130-31 (3d Cir. 2010). In the first step, "the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'" Id. at 130 (alteration in original) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 675 (2009)). Next, the factual and legal elements of a

8

claim must be separated; well-pleaded facts are accepted as true, while mere legal conclusions may be disregarded. Id. at 131-32; see Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009). Once the court isolates the well-pleaded factual allegations, it must determine whether they are sufficient to show a "plausible claim for relief." Iqbal, 556 U.S. at 679 (citing Twombly, 550 U.S. at 556); Twombly, 550 U.S. at 556. A claim is facially plausible when the plaintiff pleads facts "that allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678.

### III. Discussion

Defendants assert a twofold challenge to Woodring's complaint: *first*, defendants contend that the court lacks subject matter jurisdiction over Woodring's claims on grounds of Eleventh Amendment and state sovereign immunity; and *second*, defendants maintain that Woodring fails to state a single claim for which relief can be granted. Because our jurisdiction in this matter hinges on the viability of Woodring's federal claims, we turn to those claims first.

#### A. Federal Claims

Woodring asserts two federal claims in his complaint: a claim in Count I for violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, against the House Republican Caucus; and a claim in Count V for violation of the First Amendment under 42 U.S.C. § 1983 against the Caucus and all individual defendants in their official and personal capacities. (Doc. 1 at 22, 27). Defendants contend that we lack subject matter jurisdiction over Woodring's ADA claim; that

9

the Caucus is not a "person" subject to suit under Section 1983; and that Woodring fails to articulate personal involvement by any individual defendant.

### 1. *ADA Claim*

In Count I, Woodring asserts that the Caucus discriminated against him, created a hostile work environment, and retaliated against him in violation of Title I of the ADA. (See Doc. 1 ¶¶ 54-63). He seeks back pay, front pay, compensatory damages, punitive damages, fees, costs, and "any other available damages" from the Caucus on this count. (Id. at 32). The Caucus rejoins that it is an arm of the state legislature, and thus of the state itself, and is accordingly entitled to share in the Commonwealth's Eleventh Amendment immunity. (Doc. 12 at 6-8).

Woodring does not dispute that the House Republican Caucus, as a constituent part of the state legislature, is a state entity. (See Doc. 18 at 8-10; see also Doc. 1 ¶ 11). The Pennsylvania Commonwealth Court has concluded that the Caucus's counterpart in the state senate (the Republican Caucus of the Senate of Pennsylvania) is "part of the Senate, and as such it is 'the Commonwealth'" for purposes of state sovereign immunity. Precision Mktg., Inc. v. Commonwealth of Pa., Republican Caucus of the Senate of Pa., 78 A.3d 667, 670-75 (Pa. Commw. Ct. 2013) (*en banc*). The state court's *ratio decidendi* extends logically to the Caucus here, and Woodring does not argue to the contrary. (See Doc. 18 at 8-10). Instead, he filibusters broadly against immunity as a general principle and intimates that the Eleventh Amendment does not apply to claims under the ADA.

The Eleventh Amendment precludes federal claims for monetary damages against a state and its agencies. U.S. CONST. amend. XI; see also Kimel v. Fla. Bd. of

Regents, 528 U.S. 62, 72-73 (2000); Lombardo v. Pennsylvania, 540 F.3d 190, 194-95 (3d Cir. 2008). Eleventh Amendment immunity is not absolute. Its protections are subject to three basic limitations: (1) Congress may specifically abrogate a state's sovereign immunity by exercising its enforcement power under the Fourteenth Amendment; (2) a state may waive its sovereign immunity by consenting to suit; or (3) under *Ex parte* Young, 209 U.S. 123 (1908), a state official may be sued in their official capacity for prospective injunctive relief. See Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666, 670 (1999); Kentucky v. Graham, 473 U.S. 159, 169 & n.18 (1985); Koslow v. Pennsylvania, 302 F.3d 161, 168 (3d Cir. 2002).

None of the established exceptions to Eleventh Amendment immunity apply here.[3] The United States Supreme Court has squarely rejected Congress's attempted abrogation of the states' Eleventh Amendment immunity under Title I of the ADA. Bd. of Trs. of Univ. of Ala. v. Garrett, 531 U.S. 356, 364-74 (2001); Benn v. First Judicial Dist. of Pa., 426 F.3d 233, 238-39 (3d Cir. 2005) (citing Garrett, 531 U.S. at 363). The Commonwealth has not waived its sovereign immunity for claims under the ADA. See 42 PA. CONS. STAT. § 8521(b); Lavia v. Commonwealth of Pa., Dep't of Corr., State Corr. Inst. at Greene, 224 F.3d 190, 195-96 (3d Cir. 2000) (citing 42 PA. CONS. STAT. § 8521(b)). And this is not a suit against a state officer in their official capacity for prospective injunctive relief under *Ex parte* Young. (See Doc. 1

---

[3] Woodring perplexingly seems to admit as much in his opposition brief, observing: "Defendants cite three exceptions to the Eleventh Amendment and state sovereign immunity claims which are factually and legally inapposite to Plaintiff's case." (Doc. 18 at 9).

11

at 22, 32-33). We have little difficulty finding that the Eleventh Amendment shields the House Republican Caucus—an entity existing within, as part and parcel of, the Pennsylvania House of Representatives—from Woodring's ADA claim. We will thus dismiss the ADA claim in Count I for lack of subject matter jurisdiction.

### 2. *Section 1983 Claim*

Woodring asserts a Section 1983 claim in Count V for alleged violation of the First Amendment by the Caucus and the individual defendants in their official and personal capacities. (See Doc. 1 ¶¶ 80-88). The claim arises from Woodring's termination on March 2, 2018, for perceived violation of the Caucus's social media policy. (See id. ¶¶ 81, 85). We find that the claim fails for want of jurisdiction as to the Caucus and as to the official-capacity defendants, and for failure to state a claim as to all personal-capacity defendants except Croman.

The law is clear that neither the state nor its employees acting in their official capacities are "persons" for purposes of Section 1983. Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989). Section 1983 official capacity claims are only excepted from Eleventh Amendment immunity when the state official is sued for prospective injunctive relief. See Hindes, 137 F.3d at 165-66 (citing Hafer v. Melo, 502 U.S. 21, 27 (1991); Will, 491 U.S. at 71 n.10; Graham, 473 U.S. at 167 n.14); see also *Ex parte* Young, 209 U.S. at 159-60. Woodring seeks monetary damages as his exclusive remedy for Count V, *viz.*: "payment for all injuries and damages including compensatory damages, punitive damages (where appropriate)[,] back pay and front pay for losses suffered, and all counsel fees and costs incurred by Plaintiff." (Doc. 1 at 33). To the extent Woodring asserts Count V against the Caucus and its

12

official-capacity members and employees, these defendants are clearly immune from a claim for such damages. We will accordingly dismiss Count V against the Caucus and the official-capacity defendants for lack of jurisdiction.

Woodring also asserts his First Amendment claim against the individual defendants in their personal capacities. A Section 1983 plaintiff may seek to hold an official personally liable if that official, acting under color of state law, "caused the deprivation of a federal right." Graham, 473 U.S. at 166. The plaintiff must plead the defendant's "personal involvement in the alleged wrongs" by "describing the defendant's participation in or actual knowledge of and acquiescence in the wrongful conduct." Chavarriaga v. N.J. Dep't of Corr., 806 F.3d 210, 222 (3d Cir. 2015) (quoting Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988)). Thus, a supervisory defendant cannot be held liable for the conduct of a subordinate on a theory of *respondeat superior*. Parkell v. Danberg, 833 F.3d 313, 330 (3d Cir. 2016) (citing Chavarriaga, 806 F.3d at 227). Supervisory liability will attach in only one of two ways: *first*, when a supervisor "established and maintained a policy, practice[,] or custom which directly caused the constitutional harm," and, *second*, when the supervisor either participated in, directed, or "had knowledge of and acquiesced in their subordinates' violations." Id. (quoting Santiago, 629 F.3d at 129 n.5).

Defendants argue that Woodring has not pled personal involvement on the part of any defendant in his termination, the event on which his First Amendment claim is based. Defendants are correct as to most named defendants. Woodring does not allege, nor does his complaint permit an inference, that Representative Turzai, Representative Reed, Coates, or Eaton in any way participated in, directed,

13

or otherwise knew of and acquiesced in Wood's termination. (See Doc. 1 ¶¶ 47-49). Woodring identifies Aliano in passing, observing only that he was contacted during the March 2, 2018 meeting that preceded Woodring's termination and attempted to end the meeting during that phone call. (Id. ¶ 47). The complaint suggests that Corey, Kepner, and Hicks were present at that meeting during which Woodring "was . . . told that he was being fired," but the use of passive voice and generic pronouns precludes any determination as to what each defendant's role, if any, was in his eventual termination. (See id.) Accordingly, the court will dismiss the First Amendment claim as to Representative Turzai, Representative Reed, Coates, Corey, Eaton, Kepner, Hicks, and Aliano for failure to allege personal involvement.

We reach a different result as to defendant Croman. Woodring alleges that it was Croman, the Human Resources Director for the House Republican Caucus, who mailed him a letter dated March 7, 2018, confirming his termination and setting forth the perceived policy violations supporting the termination decision. (See Doc. 1 ¶¶ 14, 49). This allegation sufficiently tethers Croman to Woodring's purportedly unconstitutional termination. Defendants do not otherwise challenge the merits of Woodring's First Amendment claim. (See Doc. 12 at 23; Doc. 19 at 10-13). Hence, we will deny defendants' motion to dismiss Count V as to defendant Croman in her individual capacity.

### B. State Law Claims

Woodring also asserts an assortment of state statutory and common-law claims against the defendants, as follows: a claim for discrimination, hostile work environment, and retaliation pursuant to the Pennsylvania Human Relations Act

14

("PHRA"), 43 PA. STAT. AND CONS. STAT. ANN. §§ 951-963 (Count I); a claim for breach of oral contract against the Caucus (Count II); a claim for violation of Pennsylvania's Whistleblower Law, 43 PA. STAT. AND CONS. STAT. ANN. § 1421 *et seq.*, against the Caucus (Count III); and claims under Pennsylvania common law for false light against all defendants (Count IV); for civil conspiracy against defendants Croman, Coates, Corey, Eaton, Aliano, Kepner, and Hicks in their personal capacities (Count VI); for firing contrary to public policy against all defendants (Count VII); and for negligent supervision against the Caucus and Representatives Turzai and Reed (Count VIII). Defendants assert immunity defenses and merits challenges to each of these claims.

### 1. *Whistleblower Law Claim*

We turn first to Woodring's statutory claim against the House Republican Caucus under the Commonwealth's Whistleblower Law. 43 PA. STAT. AND CONS. STAT. ANN. § 1421 *et seq.* The Caucus contends that this claim is barred by the Eleventh Amendment. (See Doc. 12 at 13-14; Doc. 19 at 6-8). We agree.

Woodring ostensibly invokes the consent exception to Eleventh Amendment immunity. He posits that from his own prior experience with the Caucus, "divining legislative intent is often problematic if not impossible," suggesting that we cannot know whether the General Assembly intended to waive immunity to suit in federal

15

court under the Whistleblower Law.[4] (See Doc. 18 at 12-13). The Supreme Court requires more than personal musings on legislative intent to support a waiver of Eleventh Amendment immunity. The Court has instructed that the intent to waive such protections in federal court "must be '*unequivocally expressed*' in the text of the relevant statute." Sossamon v. Texas, 563 U.S. 277, 284-85 (2011) (emphasis added) (quoting Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 99 (1984)). We require this "clear declaration" of intent from the state "to be certain that the State in fact consents to suit." Coll. Sav. Bank, 527 U.S. at 675-76, 681 (quoting Great N. Life Ins. Co. v. Read, 322 U.S. 47, 54 (1944)). The Supreme Court has explicitly rejected the concept of "implied" waiver. Sossamon, 563 U.S. at 284 (citing Coll. Sav. Bank, 527 U.S. at 682).

The Whistleblower Law is silent as to federal court jurisdiction over the causes of action authorized therein. 43 PA. STAT. AND CONS. STAT. ANN. § 1421 *et seq.* Accordingly, the Eleventh Amendment plainly bars Woodring's Whistleblower Law claim against the House Republican Caucus. See, e.g., Bradley v. W. Chester

---

[4] Woodring also cites two district court cases, each of which entertained a Whistleblower Law claim in federal court, as support for his argument that this court can and should exercise jurisdiction. (Doc. 18 at 12 (citing Cucchi v. Kagel, No. 17-1597, 2018 WL 1141255 (E.D. Pa. Mar. 2, 2018); Dennison v. Pa. Dep't of Corr., 268 F. Supp. 2d 387 (M.D. Pa. 2003) (Munley, J.))). Both are inapposite. The court in Cucchi addressed a Whistleblower Law claim against county officials—not the state, a state agency, or its employees—and thus the Eleventh Amendment did not apply. See Cucchi, 2018 WL 1141255, at *1-2, 5-6. In Dennison, the court analyzed a Whistleblower Law claim against the individual defendants after having previously dismissed the claim against the state agency on Eleventh Amendment grounds. See Dennison, 268 F. Supp. 2d at 406-07 & n.17; see also Dennison v. Pa. Dep't of Corr., No. 3:01-CV-56, Doc. 13 at 3-4 (M.D. Pa. June 8, 2001) (Munley, J.). Woodring names only the House Republican Caucus, a state entity, as a defendant.

16

Univ. of the Pa. State Sys. of Higher Educ., 182 F. Supp. 3d 195, 201-02 (E.D. Pa. 2016); Aubrecht v. Pa. State Police, No. 2:06-CV-1053, 2009 WL 793634, at *9 (W.D. Pa. Mar. 23, 2009); Aguilar v. Pa. Apple Mktg. Program, No. 1:05-CV-804, 2006 WL 167820, at *4 (M.D. Pa. Jan. 19, 2006) (Kane, J.). We will dismiss Woodring's Whistleblower Law claim with prejudice for lack of jurisdiction.

### 2. *PHRA Claim*

Woodring's claim against the Caucus pursuant to the PHRA parallels his claim under the ADA for discrimination, hostile work environment, and retaliation. The Caucus invokes the Eleventh Amendment in defense of this claim as well. (See Doc. 12 at 7-8). The General Assembly included the Commonwealth in its definition of "employer" under the PHRA, and this language has been interpreted as a waiver of statutory sovereign immunity in state court. See Mansfield State Coll. v. Kovich, 407 A.2d 1387, 1388 (Pa. Commw. Ct. 1979). That a state consents to suit in its own courts, however, "is not a waiver of its immunity from suit in federal court." Sossamon, 563 U.S. at 285 (citing Coll. Sav. Bank, 527 U.S. at 676).

The General Assembly did not express an intent to waive Eleventh Amendment protections under the PHRA. See 43 PA. STAT. AND CONS. STAT. ANN. §§ 951-963. Absent an explicit consent to federal court jurisdiction, the Eleventh Amendment bars the instant PHRA claim against the Caucus. See, e.g., Mitchell v. Miller, 884 F. Supp. 2d 334, 380-81 (W.D. Pa. 2012) (collecting cases). We will dismiss Woodring's PHRA claim for lack of subject matter jurisdiction.

### 3. *Common-Law Tort and Contract Claims*

Woodring's common-law tort and contract claims are similarly barred by sovereign immunity. The Pennsylvania General Assembly has reaffirmed by statute the common-law doctrine of sovereign immunity for the Commonwealth, its agencies, and its employees. 1 PA. CONS. STAT. § 2310. This grant of immunity is broader in scope than Eleventh Amendment immunity: sovereign immunity shields state employees from liability so long as the individual was "acting within the scope of their duties" as an employee of the Commonwealth. See id.; see also Mitchell v. Luckenbill, 680 F. Supp. 2d 672, 681-82 (M.D. Pa. 2010) (Vanaskie, J.) (collecting cases); Minor v. Kraynak, 155 A.3d 114, 122 (Pa. Commw. Ct. 2017) (quoting La Frankie v. Miklich, 618 A.2d 1145, 1149 (Pa. Commw. Ct. 1992)).

The General Assembly expressly reserved the right to "specifically waive . . . immunity" by statute. 1 PA. CONS. STAT. § 2310. The General Assembly exercised this authority and waived immunity for damages arising from negligent acts in nine enumerated circumstances: (1) vehicle liability; (2) medical professional liability; (3) care, custody, or control of personal property; (4) state real estate, highways, and sidewalks; (5) potholes and other dangerous conditions; (6) care, custody, or control of animals; (7) liquor store sales; (8) National Guard activities; and (9) toxoids and vaccines. 42 PA. CONS. STAT. § 8522(b)(1)-(9). None of these exempted categories encompass Woodring's instant state-law claims. Compare id. with (Doc. 1 ¶¶ 54-105).

Woodring acknowledges the potential applicability of Eleventh Amendment and state sovereign immunity to his state-law claims. (Doc. 18 at 11, 16). Woodring

remonstrates that he "should at least be allowed to proceed to discovery" on the question of whether the individual defendants were acting within the scope of their employment during the course of events outlined in his complaint. (Id. at 16). As support for this request, Woodring cites to La Frankie v. Miklich, 618 A.2d 1145 (Pa. Commw. Ct. 1992), a case in which the court decided the immunity question in the Commonwealth employee's favor in a post-trial posture, with the benefit of discovery and a trial record.

La Frankie does not hold (nor does *any* apposite case hold) that statutory sovereign immunity questions can *only* be decided after discovery. Woodring does not so much as hint in his complaint that any individual defendant was or may have been acting beyond the scope of their employment. And he offers no response whatsoever to the Caucus's invocation of immunity as to these claims. Hence, the Commonwealth's sovereign immunity bars Woodring's contract and tort claims for monetary damages against both the Caucus and its employees.

### C. Leave to Amend

Woodring requests leave to amend to the extent the court deems any of his claims to be deficient. (Doc. 18 at 4-5). The Court of Appeals requires district courts to grant leave to amend in civil rights cases if a curative amendment is conceivable. See Grayson v. Mayview State Hosp., 293 F.3d 103, 108 (3d Cir. 2002). Courts are not required to grant leave to amend in non-civil-rights cases, see Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc., 482 F.3d 247, 251 (3d Cir. 2007), but leave to amend should be freely given "when justice so requires," FED. R. CIV. P. 15(a)(2).

Many of the jurisdictional defects identified herein are incurable. The ADA and PHRA claims against the Caucus, the Section 1983 claim against the Caucus and its official-capacity employees for monetary damages, and the state-law tort, contract, and statutory claims against the Caucus are barred by the Eleventh Amendment and by state sovereign immunity. These claims are legally foreclosed. The First Amendment claim against Representatives Turzai, Representative Reed, Corey, Eaton, Aliano, Kepner, and Hicks in their personal capacities, however, is factually rather than legally deficient, and leave to amend that claim is appropriate. Finally, Woodring suggests in his instant briefing that he believes some or all defendants may have been acting beyond the scope of their employment with respect to the state-law tort claims. We will grant Woodring leave to amend those claims to the limited extent Woodring has facts to support this suggestion.

## IV. Conclusion

The court will grant in part and deny in part defendants' motion (Doc. 5) to dismiss. An appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated: March 27, 2019