**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MARKUS J. WOODRING, | : | Civil No. 1:18-CV-01158 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| THE HONORABLE MIKE TURZAI, | : | |
| *et al.*, | : | |
| | : | |
| Defendants. | : | Judge Jennifer P. Wilson |

## <u>MEMORANDUM</u>

Before the court are Defendants' motion to dismiss and Defendants' motion to strike pursuant to Federal Rules of Civil Procedure 12(b)(1), (b)(6), and (f). (Doc. 41.)  This court holds that sovereign immunity precludes Plaintiff's state law claims as he failed to plead that any Defendant acted outside the scope of their employment.  The court also finds that Plaintiff's First Amendment retaliation claim survives only against Defendants Corey, Eaton, and the Estate of Karen Coates.  Furthermore, the court will not dismiss the Estate of Karen Coates, nor strike any paragraphs from Plaintiff's second amended complaint.  For the reasons that follow, the court grants in part and denies in part Defendants' motion to dismiss, and denies Defendants' motion to strike.  (Doc. 41.)

### FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On June 6, 2018, Plaintiff Markus J. Woodring ("Woodring") initiated this case by filing a complaint against John and Jane Doe #1–10 and ten named

defendants: The Republican Caucus of the Pennsylvania House of Representatives ("the Caucus"), Representative Mike Turzai ("Turzai"), Representative Dave Reed ("Reed"), Missy Haga Croman ("Croman"), Karen Coates ("Coates"), Rod Corey ("Corey"), Steven Eaton ("Eaton"), Anthony Aliano, Teresa Hart Kepner ("Kepner"), and Ann Hicks.  (Doc. 1.)  All individual defendants were members or employees of the Caucus during Woodring's employment.  (*Id.*)  This initial complaint raised several claims against Defendants, including violations of the Americans with Disabilities Act ("ADA"), Pennsylvania Human Relations Act ("PHRA"), and Pennsylvania Whistleblower Law; numerous state and common law tort and contract actions; and a claim for First Amendment retaliation under 42 U.S.C. § 1983.  (*Id.* ¶¶ 22–32.)  Woodring sued the individual Defendants in their official and individual capacities.

On July 20, 2018, Defendants filed a motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  (Doc. 5.)  Chief United States District Judge Christopher C. Conner granted the motion in part and denied the motion in part on March 27, 2019.  *Woodring v. Republican Caucus of the Pa. House of Representatives*, No. 1:18-CV-1158, 2019 WL 1383633 (M.D. Pa. March 27, 2019) (Conner, C.J.) (hereinafter *Woodring I*).  Specifically, the court held that Eleventh Amendment immunity and sovereign immunity shielded Defendants from Woodring's ADA, PHRA, Pennsylvania Whistleblower Law, and common

law tort and contract claims. *Woodring I*, 2019 WL 1383633 at \*5–9. As to the

First Amendment retaliation claim, the court dismissed the claim against the

Caucus and individual Defendants in their official capacities but permitted the

claim to proceed against Defendant Croman in her individual capacity because the

complaint alleged sufficient facts to tie her to the purportedly unconstitutional

termination. *Id.* at \*6–7. Accordingly, the court dismissed without prejudice

Woodring's claims against all individual Defendants except Croman. *Id.* at \*14.

The court granted Woodring leave to amend the First Amendment retaliation claim

and common law tort claims against the individual Defendants in their personal

capacities. *Id.* at \*20. The court also took judicial notice of Defendant Coates'

death and extinguished any claims against her in her personal capacity. *Id.* at \*20,

n.1.

Woodring filed an amended complaint on April 16, 2019, which set forth

five causes of action. (Doc. 22.) Defendants filed a motion to dismiss the

amended complaint on April 30, 2019. (Doc. 25.) On May 7, 2019, the court

ordered Defendants to respond to Woodring's outstanding discovery requests

regarding the John and Jane Doe individuals involved in Woodring's firing. (Doc.

30.) The order also directed Woodring to add any additional parties by July 29,

2019. (*Id.*) Defendants responded to Woodring's discovery requests on June 28,

2019. (Doc. 37, ¶ 11.) Woodring timely filed a motion to substitute John and Jane

3

Doe #1–10 for the Estate of Karen Coates.  (Doc. 37.)  The court granted this motion giving Woodring leave to file a second amended complaint including the Estate of Karen Coates ("the Estate") as a defendant, and denying as moot Defendants' motion to dismiss the amended complaint.  (Doc. 39.)

On August 6, 2019, Woodring filed a second amended complaint against Turzai, the current Speaker of the Pennsylvania House of Representatives; Reed, the current Majority Leader of the Pennsylvania House of Representatives; Croman, the Human Resources Director for the Caucus; Corey, the Chief Counsel for the Caucus; Eaton, the Caucus' IT Director and Woodring's supervisor; Kepner, the Assistant Human Resources Director for the Caucus; and Coates' Estate, the successor to Coates, the Chief of Staff/Chief Counsel for Turzai.  (Doc. 40, ¶¶ 9–16.)  The second amended complaint set forth five claims against Defendants in their personal capacity: false light (Count I); 42 U.S.C. § 1983 First Amendment Retaliation (Count II); conspiracy to violate civil rights (Count III); firing contrary to public policy (Count IV); and negligent supervision against only Turzai and Reed (Count V).  (*Id.*)

The following facts are gleaned from Woodring's second amended complaint and are taken as true for purposes of ruling on Defendants' motion to dismiss.  Woodring's claims emerge from alleged misconduct by employees and members of Woodring's former employer, the Caucus.  (Doc. 40, ¶¶ 1–3.)

Woodring was employed in the Caucus's IT department from 2005 until his termination in 2018.  (*Id.* ¶¶ 20, 42.)  In 2008, Woodring spoke to representatives of the Pennsylvania Office of the Attorney General, exposing the Caucus's misuse of public funds and IT resources for personal purposes.  (*Id.* ¶ 23.)  His statements and grand jury testimony contributed to the "Computergate" investigation, a widely-publicized investigation which lead to the conviction of former Speaker of the House John Perzel.  (*Id.* ¶ 18, 23–24.)  Woodring alleges that Caucus employees not named in this suit intimidated him and threatened his job due to his cooperation with the Office of the Attorney General.  (*Id.* ¶ 24.)

Woodring alleges that one of his coworkers falsely accused him of assault where "the accusations were fabricated and [Woodring] was clearly innocent."  (*Id.* ¶ 25–26.)  Nevertheless, Woodring had to "endure an investigation."  (*Id.* ¶ 25.)  While Woodring was found innocent, Woodring alleges it took years "for this unfounded incident to finally be removed from his personnel file."  (*Id.* ¶¶ 25–26.)  Woodring also avers that no one answered his numerous complaints about government waste.  (*Id.* ¶ 28–35.)

Woodring pleads that he was "repeatedly and continually denied raises and promotions" and threated with firing after his "Computergate" cooperation.  (*Id.* ¶ 27.)  He asked Defendant Croman if the Caucus had a hiring policy; she responded the Caucus did have a policy, but it was not written down.  (*Id.*)

Woodring asserts that Defendant Corey later produced a written policy and claimed that the Caucus possessed the policy since March 2015 in clear contradiction of Defendant Croman's claims.  (*Id.*)  Woodring asserts that Defendant Eaton failed to follow the policy and merely handpicked his personal favorites for promotion and raises.  (*Id.*)  Generally, Woodring pleads that his "initiative, so as to get what should have been reasonably available," motivated Defendants to obstruct and retaliate against him.  (*Id.*)

In August 2016, Woodring learned that he needed back surgery.  (*Id.* ¶ 36.) Woodring avers that under the Caucus's "Donated Leave Policy" he planned to use donated leave time from other Caucus employees to cover his time out of work. (*Id.*)  Defendant Croman and a "panel" decided, without consulting any medical records or waiting for Woodring to submit his application, that Woodring did not qualify for borrowed time because Woodring did not suffer a "catastrophic injury." (*Id.* ¶ 37.)  Woodring alleges that his efforts to borrow time "fueled Ms. Croman's personal motivation to retaliate against [Woodring] and ultimately fire him."  (*Id.*) Woodring further pleads that Defendants Croman and Kepner further retaliated against him by writing him up for asking to borrow time in accordance with the employee handbook.  (*Id.* ¶ 38.)  Woodring avers that "[t]his retaliatory write up was prior to even using [Woodring's] borrowed time and evidenced Defendant Croman and Defendant [Kepner's] personal motivation to retaliate against

[Woodring] and ultimately fire him." (*Id.*)  Upon returning to work in September 2016, Woodring asserts that Defendant Croman wrote him up two separate times for "using his own borrowed time" and "taking a sick day when he was allegedly short by one-half of an hour." (*Id.* ¶ 39.)  Woodring claims these incidents were "yet one more example of retaliation against [Woodring] by Defendant Croman evidencing her personal motivation to retaliate against [Woodring] and ultimately fire him." (*Id.*)  Woodring eventually met with Defendant Kepner to discuss his personnel file, where Woodring discovered "unsubstantiated claims that he abused time." (*Id.* ¶ 40.)  Defendant Kepner mentioned that Woodring may not have been promoted due to his number of days off. (*Id.*)  As a result of this May 19, 2017 meeting, Woodring filed a complaint with the EEOC. (*Id.*)

On the afternoon of March 2, 2018, the Caucus Human Resources Department called Woodring into a meeting where Defendants Croman, Kepner, and Corey were present. (*Id.* ¶ 42.)  Because Woodring believed he was going to be fired, he informed the group that he was recording the meeting. (*Id.*)  This led to an argument between Woodring and the Caucus Human Resources representatives which ended when Caucus representatives called Anthony Aliano ("Aliano"), Defendant Reed's Chief of Staff. (*Id.*)  Aliano told the group to postpone the meeting until Monday. (*Id.*)  However, the meeting continued, and Woodring was "then told that he was being fired." (*Id.*)  Woodring avers that

when he asked why he was fired, Defendants Corey and Kepner told him he violated "many Caucus policies" but would not specify which policies he violated. (*Id.*)  Woodring asserts that he asked why he was not written up for his violations and received no answer.  (*Id.*)  In an "unnecessary" display undertaken "to demean [Woodring] in the eyes of his coworkers," Capitol Police and House Security then escorted Woodring out of the building in plain view of his coworkers.  (*Id.* ¶ 43.)

On March 7, 2018, Woodring received the following letter from Defendant Croman affirming his termination:

> On Friday, March 2, 2018, you were informed of your termination of employment effective immediately; you will remain on the payroll through March 23, 2018.  Your termination of employment is due to multiple violations of the Pennsylvania House of Representatives Republican Caucus Employee Handbook which, include but are not limited to:
>
> House Republican Caucus Email Policy – Appropriate use of the e-mail system must serve the legitimate public interest of the Republican Caucus of the House of Representatives and its Members. Unacceptable use of the email system includes but is not limited to: [3] Transmitting any message for the purpose of intimidating, harassing or abusing others or which is offensive or defamatory in nature.
>
> House Republican Caucus Internet Policy – Employees are prohibited from using internet connections, including connections to social media, for improper purposes, including, but not limited to usage in the following matter: [9] To post or transmit information or communications that are defamatory, fraudulent, or deceptive; [12] To use the Internet in such fashion that impairs the legitimate work product of the employee or causes disruption of the work of others; [16] To use the system in an [sp] manner that is inconsistent with the best interests of the Republican Caucus, or which will cause it, its members or its employees to be ridiculed or held in disrepute.

> House Republican Caucus Social Media Policy – Employees of the House Republican Caucus shall not post or transmit to any social media any information which is "is harassing, defamatory or degrading concerning the House Republican Caucus, its members or employees" regardless of whether such post is made during the employees' working hours or via any system or equipment owned or operated by Republican Information Technology Services.

(*Id.* ¶ 44.)  Woodring contends that this letter is in reference to a social media post he made as he does not use the Caucus email system or internet connections.  (*Id.*) Woodring asserts that Defendants purposefully excluded a key component of the Social Media Policy which provides:

> Employees of the House Republican Caucus shall not post or transmit to any social media any information which:
>
> (1) is harassing, defamatory or degrading concerning the House Republican Caucus, its members or employees, and
>
> **(2) is not a matter of public concern.**

(*Id.* (emphasis in original).)  The letter still did not provide the specific reason for Woodring's termination.  (*Id.* ¶ 45)

Woodring alleges that he officially discovered why he was terminated during a March 24, 2018 unemployment hearing.  (*Id.* ¶ 46.)  At the hearing, counsel for the Caucus introduced a March 1, 2018 Facebook post by Woodring. (*Id.*)  The post pinned a local news article titled "Pa. lawmaker accused of abusive behavior and sexual misconduct called on to resign."  (*Id.* ¶ 44.)  The main body of the post included Woodring's analysis of the article: "Wow! Here's the collusion

that everyone's been looking for.  Two women, same attorney?  That's not

coincidence by chance.  Innocent until proven guilty!  I smell a railroad

somewhere!!"  (*Id.*)  Woodring maintains that he was speaking as citizen,

protesting the possibility of an elected official "being railroaded out of office

without due process."  (*Id.* ¶ 47.)  He also generally alleges discriminatory

practices, acts, and failures to act in violation of the Pennsylvania Whistleblower

law.  (*Id.* ¶ 48.)

On August 27, 2019, Defendants filed the instant motion to dismiss the

second amended complaint under Rules 12(b)(1) and 12(b)(6), and motion to strike

certain paragraphs of the second amended complaint under Rule 12(f).  (Doc. 41.)

A brief in support was filed on September 10, 2019, followed by a brief in

opposition on September 23, 2019.  (Docs. 42, 43.)  On November 14, 2019, this

case was reassigned to the undersigned.  The motion is now fully briefed and ripe

for disposition.

## JURISDICTION

Because this case raises federal questions under 28 U.S.C. § 1983 for First

Amendment retaliation, the court has original jurisdiction pursuant to 28 U.S.C.

§ 1331, and supplemental jurisdiction over the state law claims under 28 U.S.C.

§ 1367(a).  Further, venue is appropriate as all the actions detailed in the complaint

occurred within the Middle District of Pennsylvania.

## STANDARDS OF REVIEW

### A. Rule 12(b)(1)

Defendants' motion to dismiss for lack of subject matter jurisdiction invokes Federal Rule of Civil Procedure 12(b)(1).  The standard of review for a Rule 12(b)(1) motion differs depending on the specific substance of the motion, requiring the court to determine if the motion is a facial or factual attack.  *CNA v. United States*, 535 F.3d 132, 139 (3rd Cir. 2008).

A facial attack is "an argument that considers a claim on its face and asserts that it is insufficient to invoke the subject matter jurisdiction of the court." *Constitution Party of Pa. v. Aichele*, 757 F.3d 347, 357 (3rd. Cir. 2014).   When reviewing a facial attack, the court must accept the factual allegations as true and construe them in the light most favorable to the plaintiff.  *In re Schering Plough Corp. Intron*, 678 F.3d 235, 243 (3rd. Cir. 2012).  A facial attack can occur anytime before the moving party has answered the complaint or contested any factual allegations of the complaint.  *Aichele*, 757 F.3d at 358.  When ruling on a facial attack, the court must apply the same standard of review it would use in considering a motion to dismiss under Rule 12(b)(6).  *Id.*

Alternatively, a factual attack is an argument that subject matter jurisdiction does not exist "because the facts of the case . . . do not support the asserted jurisdiction."  *Id.*  For factual attacks, courts can consider evidence outside of the

proceedings, and the allegations contained in the complaint are not presumptively true. *CNA*, 535 F.3d at 139.   A factual attack requires a factual dispute. Therefore, a party must file an answer or otherwise present competing facts for the court to consider the motion a facial attack. *Mortensen v. First Fed. Sav & Loan Ass'n*, 549 F.2d 884, 892 n.17 (3d Cir. 1977) ("A factual jurisdictional proceeding cannot occur until plaintiff's allegations have been controverted."); *Aichele*, 757 F.3d at 358.  The plaintiff has the burden of establishing jurisdiction when defending against both factual and facial attacks. *Woodring I*, 2019 WL 1383633 at *4.

Here, the court will review Defendants' subject matter jurisdiction arguments in relation to Eleventh Amendment and common law sovereign immunity as a facial attack. *See Aichele*, 757 F.3d at 357–59.

## B. Rule 12(b)(6)

In considering a Rule 12(b)(6) motion, courts must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (quoting *Pinker v. Roche Holdings, Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002)).  This type of motion to dismiss tests the sufficiency of the complaint against the pleading requirements of Rule 8(a) necessitating "a short and

plain statement of the claim showing that the pleader is entitled to relief," and giving "the defendant fair notice of what the . . . claim is and the grounds upon which it rests."  Fed. R. Civ. P. 8(a)(2); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  Although a complaint need not contain detailed factual allegations, to survive a Rule 12(b)(6) motion, it must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).  However, the court cannot dismiss a complaint simply because "it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits."  *Phillips*, 515 F.3d at 231 (citing *Twombly*, 550 U.S. at 556–57). Rather, Rule 8 requires "enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Id.* at 234.

## DISCUSSION

Defendants set forth four arguments in their motion to dismiss.  First, Defendants move to dismiss the common law tort claims arguing that the claims are barred by sovereign immunity.  (Doc. 42, pp. 6–10.)[1]  Next, Defendants move to dismiss Woodring's First Amendment retaliation claim against all Defendants except Defendant Croman, maintaining that Woodring failed to plead affirmative

---

[1] For ease of reference, the court utilizes the page numbers from the CM/ECF header.

personal involvement by the Defendants other than Defendant Croman in the alleged wrong.  (*Id.* at 10–14.)  Defendants move to dismiss all claims against the Estate, claiming that Woodring failed to add the Estate as a party within ninety days as required by Federal Rule of Civil Procedure 25(a)(1).  (*Id.* at 16–18.) Lastly, Defendants move to strike certain portions of the complaint under Federal Rule of Civil Procedure 12(f) as redundant, immaterial, impertinent or scandalous matter.  (*Id.* at 14–16.)  The court will address each argument in turn.

### A. Woodring's common law tort claims are barred by sovereign immunity.

Woodring sets forth four common law tort claims against Defendants in their personal capacities: false light (Count I); civil conspiracy (Count III); wrongful termination (Count IV); and negligent supervision against only Defendants Reed and Turzai (Count V).  This court concludes that all of these claims are barred by sovereign immunity.

The Commonwealth of Pennsylvania maintains sovereign immunity for its agencies and employees for common law tort and contract claims.  1 Pa. Cons. Stat. § 2310; *Mitchell v. Luckenbill*, 680 F. Supp. 2d 672, 682 (M.D. Pa. 2010). Sovereign immunity bars claims against Commonwealth employees acting within the scope of their employment "even when a plaintiff asks for monetary damages against a defendant in his individual capacities."  *Luckenbill*, 680 F. Supp. 2d. at 682 (quoting *Jackson v. Nassan*, No. 2:08-cv-1054, 2009 WL 2707447, at *6

(W.D. Pa. Aug. 26, 2009).  Accordingly, if an employee was acting within the scope of their employment, sovereign immunity applies to employees in both their individual and official capacities.  *Palmer v. Pa. State Police*, No. 3:17-CV-00371, 2018 U.S. Dist. LEXIS 174442, at *24 (M. D. Pa. Oct. 9, 2018).

Sovereign immunity is waived for damages arising from negligence acts in nine circumstances: (1) vehicle liability; (2) medical-professional liability; (3) care, custody, or control of personal property; (4) Commonwealth real estate, highways and sidewalks; (5) potholes and other dangerous conditions; (6) care, custody or control of animals; (7) liquor store sales; (8) National Guard activities; and (9) toxoids and vaccines.  42 Pa. Const. Stat. § 8522(b)(1)–(9).  Outside of these exceptions, the applicability of sovereign immunity to a claim against a Commonwealth employee depends on whether the employee was acting within the scope of their employment.  Under Pennsylvania law, conduct is within the scope of employment if: "(1) it is the kind the employee is employed to perform; (2) it occurs substantially within the authorized time and space limits; [and] (3) it is actuated, at least in part, by a purpose to serve the [employer]."  *CNA*, 535 F.3d at 146 (quoting *Brumfield v. Sanders*, 232 F.3d 376, 380 (3d. Cir. 2000)).

Courts treat sovereign immunity as an affirmative defense.  *Justice v. Lombardo*, 208 A.3d 1057, 1068 (Pa. 2019).  Thus, Defendants carry the burden of proving their conduct was within the scope of their employment.  *Id.*  Ordinally,

whether an act of an employee is within the scope of their employment is a question of fact for the jury. *Id.* However, the court may decide the scope of employment question as a matter of law "where neither the facts nor the inferences to be drawn from them are in dispute." *Id.* In opposing Defendants' motion, Woodring argues again that the court should allow discovery so it can determine if Defendants were acting in their individual capacities. (Doc. 43, p. 10.) In *Woodring I*, the court held that no case holds "that statutory sovereign immunity questions can *only* be decided after discovery." *Woodring I*, 2019 WL 1383633 at *9 (emphasis in original). Accordingly, this court can rule on the issue of whether Defendants were acting within the scope of their employment prior to completing discovery.

In this case, Defendants are employees or members of the Caucus[2] sued in their individual capacities. Woodring's claims do not fall under any of the statutory exceptions in 42 Pa. Const. Stat. § 8522(b). Accordingly, common law sovereign immunity applies if Defendants were acting within the scope of their employment. Woodring fails to plead any facts, nor can the court draw any favorable inferences, that show Defendants acted outside the scope of their employment. All of Woodring's claims rest on the foundation of Defendants'

---

[2] The parties agree the Caucus, as a constituent part of Pennsylvania's legislature, is a Commonwealth entity. (Doc. 12, p. 6–8); *Woodring I*, 2019 WL 1383633 at *5.

employment with the Caucus.  All acts of the Defendants were of the kind the Defendants were employed to perform, within the authorized space and time limits of their employment; and were actuated, at least in part, by a purpose to serve the Caucus.

Similar to his previous complaint, Woodring fails to plead or "so much as hint in his complaint that any individual defendant was or may have been acting beyond the scope of their employment." *Wooding I*, 2019 WL 1383633 at *9. Specifically, in Count I, Woodring pleads a claim for false light relating to when Defendants had Capitol Security remove Woodring from the Capitol after his termination.  Woodring fails to assert that Defendants were not allowed to conduct basic security as part of their employment.  Moreover, Woodring was removed from the Caucus during normal working hours, satisfying the space and time requirement.

Count III and IV assert causes of action for civil conspiracy and wrongful termination, respectively.  These claims both arise from Woodring's termination, and Woodring does not claim that Defendants took any action related to his firing outside the spatial and temporal confines of employment.  Lastly, Count V asserts a claim of negligent supervision against Defendants Turzai and Reed.  Their duties of employment clearly involve supervising their employees, which occurred in the temporal and spatial limits of work.

17

Therefore, because Woodring fails to plead any facts sufficient to establish (or even create an inference) that Defendants acted outside the scope of their employment, the court will dismiss Counts I, III, IV, and V of Woodring's second amended complaint.  District courts may dismiss complaints with prejudice if amendment would be futile.  *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d. Cir. 2002).  In *Woodring I*, the court granted Woodring leave to amend his common law tort claims to appropriately plead Defendants were acting outside the scope of their employment.  *Woodring I*, 2019 WL 1383633 at *9.  Given the opportunity to amend, Woodring failed to plead the necessary facts in the instant second amended complaint.  Therefore, further leave to amend is futile.  Accordingly, the court will dismiss Counts I, III, IV, and V with prejudice.

### B. Woodring's First Amendment retaliation claim under 42 U.S.C. § 1983 survives against those Defendants who purportedly had personal involvement in his termination.

Woodring asserts a First Amendment retaliation claim under 42 U.S.C. § 1983 against all individual Defendants in their personal capacities.[3]  At this stage, Defendants do not challenge the merits of Woodring's First Amendment retaliation claim.  Rather, they argue that Woodring fails to plead personal

---

[3] In *Woodring I*, the court dismissed Woodring's First Amendment retaliation claim against the Caucus and Defendants in their official capacities for lack of subject matter jurisdiction as "neither the state nor its employees acting in their official capacities are 'persons' for purpose of Section 1983." *Woodring I*, 2019 WL 1383633 at *6 (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989)).  Now, in his second amended complaint, Woodring only brings claims against Defendants in their individual capacities.

involvement.  (Doc. 42, pp. 10–14.)  Therefore, this court need not analyze all of the elements of Woodring's First Amendment retaliation claim at this juncture.

To state a claim under 42 U.S.C. § 1983 for violation of a substantive right, Plaintiffs must plead two threshold requirements: (1) that the alleged misconduct was committed by a person acting under color of state law; and (2) that as a result, he was deprived of rights, privileges, or immunities secured by the Constitution or laws of the United States.  *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).  To assert a claim against defendants in their personal capacities, a plaintiff must plead each defendant's "personal involvement in the alleged wrongs."  *Chavarriaga v. N.J. Dep't of Corr.*, 806 F.3d 210, 222 (3d Cir. 2015) (*citing Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988)).  A plaintiff can plead personal involvement by alleging the defendant's "participation in or actual knowledge of and acquiescence in the wrongful conduct."  *Chavarriaga*, 806 F.3d at 222.  Based on the circumstances of the case, the court can infer contemporaneous knowledge of wrongful conduct, but the knowledge must be actual, not constructive.  *Id.*  Generally, a plaintiff "must portray specific conduct by state officials which violates some constitutional right."  *Id.* (citing *Gittlemacker v. Prasse*, 428 F.2d 1, 3 (3d Cir. 1970)).

A plaintiff cannot plead actual knowledge and acquiescence merely by asserting that a defendant holds a supervisory position on a theory of *respondeat*

*superior.  Parkell v. Danberg*, 833 F.3d 313, 330 (3d Cir. 2016) (citing

*Chavarriaga*, 806 F.3d at 227).  However, supervisory liability can attach when a

supervisor "established and maintained a policy, practice[,] or custom which

directly caused the constitutional harm," or when the supervisor participated in,

directed, or "had knowledge of and acquiesced in their subordinates' violations."

*Id.* (quoting *Santiago v. Warminster Twp.*, 629 F.3d 121, 129, n.5 (3d Cir. 2010)).

Here, Woodring's retaliation claims are based solely on his termination.

(Doc. 40, ¶¶ 54–52.)  In other words, his termination is the "alleged wrong."  As

such, the alleged misconduct by any Defendant must be related to Woodring's

termination.  *Woodring I*, 2019 WL 1383633 at *7.  Woodring alleges he was

terminated at a March 2, 2018 meeting where Croman, Kepner, and Corey were

present.  Following the meeting, Woodring received a letter partially explaining his

termination.  For Woodring's claims against a specific defendant to survive,

Woodring must plead personal involvement by that defendant in either the

termination decision, meeting, or letter.

Although given the opportunity to amend his complaint to plead Defendants'

personal involvement, Woodring has failed to do so.  In fact, the allegations

regarding his termination are nearly identical in both complaints.  (*Compare* Doc.

1, ¶¶ 47–53, *with* Doc. 40, ¶¶ 42–48.)  As to Defendants Turzai and Reed,

Woodring alleges that "upon information and belief, given [their] position [they]

would have passed upon Plaintiff's firing." (Doc. 40, ¶¶ 10–11.) Other than this vague allegation, Woodring does not allege or infer that Defendants Turzai and Reed in any way participated in, directed, or otherwise knew of and acquiesced in Woodring's termination. (*See id.* ¶¶ 42–48.) Similarly, Woodring does not claim that Eaton participated in, directed, or otherwise knew of Woodring's termination. Simply stating that Eaton "advocated for the firing of Plaintiff" and harbored a "personal animus" towards Woodring is insufficient for personal involvement.

Due to Woodring's use of passive voice throughout the complaint and the presence of multiple individuals at the meeting, it is unclear exactly who fired Woodring. However, regarding Defendants Kepner and Corey, the second amended complaint specifically states that Kepner and Corey were present at the meeting during which Woodring was "told that he was being fired." (Doc. 40, ¶ 42.) Woodring pleads that when he asked for a reason for his firing, he was "simply told by Defendant Corey and Defendant Kepner that he had violated 'many Caucus policies.'" (*Id.*) Although it is unclear who actually fired Woodring and the level of involvement of Defendants Corey and Kepner, based on the facts alleged in the second amended complaint, Defendants Corey and Kepner were present, had knowledge of, and participated in the firing of Woodring to some extent. Thus, the allegations of personal involvement are sufficient for Woodring's

First Amendment retaliation claim to survive a motion to dismiss against Defendants Corey and Kepner.

As to the Estate, Woodring pleads that Coates "ultimately was involved in the decision to fire" Woodring, and "[s]he participated with others in the final meeting with [Woodring] wherein he was notified that he was being fired." (Doc. 40, ¶ 15.)  Woodring also alleges that, according to Defendants' discovery responses, Coates "made the decision to discharge Plaintiff." (*Id.* ¶ 16.)  These allegations are adequate to show Coates' personal involvement in Woodring's termination at this stage.

Accordingly, the court will grant Defendant's motion to dismiss Count II as to Defendants Turzai, Reed, and Eaton, and deny the motion as to Defendants Corey, Kepner, and the Estate.[4]  The court will also dismiss Defendants Turzai, Reed, and Eaton from this action with prejudice.

### C. The court will follow Chief Judge Conner's prior order permitting the Estate to remain as a defendant.

On July 29, 2019, Woodring filed a motion requesting leave to file a second amended complaint.  (Doc. 37.)  Woodring requested the opportunity to file a second amended complaint for the sole purpose of replacing Defendants John/Jane

---

[4] In *Woodring I*, the court permitted the claim against Defendant Croman in her personal capacity to proceed. *Woodring I*, 2019 WL 1383633 at *7.  Defendants' briefing clarifies that Defendant Croman does not join in Defendants' motion to dismiss as to the First Amendment retaliation claim. (Doc. 42, p. 4 n.3.)  As such, the claim against Defendant Croman will proceed.

Doe #1–10 with the Estate of Karen Coates.  (*Id.*)  In his motion, Woodring

explains that he received discovery responses from Defendants indicating that

Coates made the decision to fire Woodring.  (*Id.* at 5.)  Chief Judge Conner's July

31, 2019 order expressly grants Woodring leave to amend his complaint to include

the Estate of Karen Coates as a defendant.  (Doc. 39.)

Defendants now argue that the court should dismiss all claims against the

Estate under Federal Rule of Civil Procedure 25(a)(1).  (Doc. 42, p. 16.)  Federal

Rule of Civil Procedure 25(a)(1) provides that "a motion for substitution may be

made by any party or by the decedent's successor or representative.  If the motion

is not made within 90 days after service of a statement noting the death, the action

by or against the decedent must be dismissed."  Fed. R. Civ. P. 25(a)(1).  Because

*Woodring I*, docketed on March 27, 2019, contained a statement noting the death

of Coates, Defendants argue Woodring's deadline to substitute the Estate as a party

expired on June 25, 2019.  (Doc. 41, p. 17; *Woodring I*, 2019 WL 1383633 at *1

n.1.)

This court will deny Defendants' motion and permit the Estate to remain as a

Defendant for two reasons.  First, there is no basis to contradict Chief Judge

Conner's July 31, 2019 order which specifically granted Woodring leave to amend

his complaint for the purpose of adding the Estate as a defendant.  Woodring

timely substituted the Estate per Chief Judge Conner's order.  This court will

uphold the "law of the case" and will not reconsider an issue previously decided by Chief Judge Conner. *Fagan v. City of Vineland*, 22 F.3d 1283, 1290 (3d. Cir. 1994) (explaining that the "law of the case" doctrine encourages judges not to overturn decisions of their predecessors). Second, Federal Rule of Civil Procedure 6(b)(1)(B) states: "When an act may or must be done within a specific time, the court may, for good cause, extend the time: . . . (B) on motion after the time has expired if the party failed to act because of excusable neglect." Fed. R. Civ. P. 6(b)(1)(B). The court finds that Woodring failed to add the Estate of Karen Coates for an excusable reason, as Woodring did not receive Defendants' discovery response until after the ninety-day timeframe. Accordingly, the court will deny Defendants' motion to dismiss the Estate as a defendant.

### D. The court will deny Defendants' motion to strike.

Defendants also move to strike certain averments from Woodring's second amended complaint under Federal Rule of Civil Procedure 12(f). Rule 12(f) grants the court discretion to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. Pro. 12(f). "[R]elief under Rule 12(f) is generally disfavored and will be denied unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties, or if the allegations confuse the issues in the case." *Simmons v. Simpson House*, 224 F. Supp. 406, 421 (E.D. Pa. 2016) (citing *Siler v. Cmty. Educ.*

*Ctrs. Inc.*, No. 14-5019, 2014 WL 4931291, at *4 (E.D. Pa. Oct. 2, 2014)); *see also*

*Fox v. Lackawanna Cty.*, No. 3:16-CV-1511, 2017 U.S. Dist. LEXIS 181618, at

*33 (M.D. Pa. Nov. 2, 2017) ("relief will be denied unless the allegations have no

possible relation to the matter at hand").  Courts decide Rule 12(f) motions on the

pleadings alone.  *Fox*, 2017 U.S. Dist. LEXIS 181618 at *14.

Here, Defendants move to strike paragraphs 18, 19, and 21 through 35 from

Woodring's second amended complaint.  (Doc. 42, pp. 14–16.)  Defendants

contend that these paragraphs solely relate to Woodring's former Pennsylvania

Whistleblower Law claim that the court dismissed in *Woodring I*.  (*Id.*; *Woodring

I*, 2019 WL 1383633 at *7–8.)  Defendants also move to strike paragraphs 36

through 41, which contain averments relating to Woodring's alleged disability and

use of sick leave.  (Doc. 42, pp. 14–16.)  Defendants argue that these paragraphs

only relate to Woodring's former claim under the ADA, which the court similarly

dismissed in *Woodring I*.  (*Id.*; *Woodring I*, 2019 WL 1383633 at *5.)  Defendants

argue that all these averments are "wholly irrelevant" to the claims at issue.  (Doc.

42, pp. 14–16.)

While the court recognizes that Woodring's averments in the identified

paragraphs mostly relate to previously dismissed claims, the court cannot find that

Woodring's allegations have no possible relation to the matter at hand.  At the

least, Woodring's averments tend to support his allegation of an atmosphere of

cover-ups and retaliation within the Caucus.  Woodring alleges this retaliatory environment contributed to his firing.  Woodring's averments also provide potentially relevant background facts for specific scenarios that led Defendants to harbor a personal dislike of Woodring, shedding light on Defendants' alleged motive for Woodring's termination.  Thus, the court cannot find that paragraphs 18, 19, and 21 through 41 reach the high standard required in order to grant a motion to strike.  Accordingly, the court will deny Defendants' motion to strike under Rule 12(f).

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss is granted in part and denied in part, and Defendants' motion to strike is denied in its entirety.  An appropriate order will issue.

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Court Judge
Middle District of Pennsylvania

Dated: May 15, 2020